Matter of Tammy OO. v New York State Off. of Children & Family Servs. (2022 NY Slip Op 00706)





Matter of Tammy OO. v New York State Off. of Children & Family Servs.


2022 NY Slip Op 00706


Decided on February 3, 2022


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:February 3, 2022

532633
[*1]In the Matter of Tammy OO., Petitioner,
v
New York State Office of Children and Family Services et al., Respondents.

Calendar Date:December 16, 2021

Before:Garry, P.J., Lynch, Aarons and Reynolds Fitzgerald, JJ.; Clark, J., vouched in.

Bartlett, Pontiff, Stewart & Rhodes, PC, Glens Falls (Karla W. Buettner of counsel), for petitioner.
Letitia James, Attorney General, Albany (Kevin C. Hu of counsel), for respondents.



Lynch, J.
Proceeding pursuant to CPLR article 78 (transferred to this Court by order of the Supreme Court, entered in Washington County) to review a determination of respondent Office of Children and Family Services denying petitioner's application to have reports maintained by the Central Register of Child Abuse and Maltreatment amended to be unfounded and expunged.
Petitioner is the mother of the subject child (born in 2001). In 2018, respondent Office of Children and Family Services (hereinafter OCFS) received a report alleging maltreatment by petitioner. The Washington County Department of Social Services (hereinafter DSS) investigated the report and eventually determined that it was indicated, meaning there was some credible evidence that the maltreatment occurred (see Social Services Law § 412 [7]). In particular, the report found that petitioner "failed to make or assist in facilitating an adequate plan for [the child]." Petitioner thereafter requested to have the report amended as unfounded. Following an administrative review and a hearing, OCFS denied petitioner's request. Petitioner subsequently commenced this CPLR article 78 proceeding seeking annulment of OCFS's determination. The matter was thereafter transferred to this Court (see CPLR 7804 [g]).
"To establish maltreatment, the agency was required to show by a fair preponderance of the evidence that the physical, mental or emotional condition of the child had been impaired or was in imminent danger of becoming impaired because of a failure by petitioner to exercise a minimum degree of care in providing the child with appropriate supervision or guardianship" (Matter of Gerald HH. v Carrion, 130 AD3d 1174, 1175 [2015] [citations omitted]; see Matter of Sleiman v New York State Cent. Register of Child Abuse & Maltreatment, 193 AD3d 1323, 1323-1324 [2021]). "[H]earsay is admissible in expungement hearings and, if sufficiently relevant and probative, may constitute substantial evidence to support the underlying determination" (Matter of Ribya BB. v Wing, 243 AD2d 1013, 1014 [1997] [internal quotation marks and citations omitted]; see Matter of Michael NN. v Chenango County Dept. of Social Servs., 155 AD3d 1463, 1465 [2017]). Our review "is limited to whether the determination to deny the request to amend . . . the indicated report is supported by substantial evidence in the record" (Matter of Sleiman v New York State Cent. Register of Child Abuse & Maltreatment, 193 AD3d at 1323 [internal quotation marks, brackets and citation omitted]) — a minimal standard that requires "such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact" (id. [internal quotation marks and citations omitted]).
The record evidence, which included the hearing testimony and the progress notes of the investigating caseworker, established that, on October 25, 2018, a report was made to the Central Register of Child Abuse and Maltreatment stating that petitioner was refusing [*2]to allow the child — who was then 16 years old — into the home. The next day, a DSS caseworker spoke by phone with petitioner, the child's older sister and the sister's next door neighbor. At that point, it was disclosed that the child left petitioner's home in the summer of 2017, when she was 15 years old, and moved in with the sister. The sister and the child relocated to Fair Haven, Vermont in early 2018. The sister explained that the child left her home the week before, after she confronted the child over concerns of promiscuous behavior and the use of marihuana. The child then stayed with a friend for a few days but, after an argument, moved in with the neighbor.
On October 29, 2018, the caseworker visited the neighbor's home and found it to be safe. At that visit, the caseworker also spoke with the child, who advised that petitioner told her to leave in the summer of 2017 and the sister did the same the week before. The child explained that she tried to speak with petitioner, but petitioner told her to stop calling and then blocked her phone. On November 14, 2018, the neighbor advised the caseworker that the child could no longer stay at her home since the neighbor's boyfriend was being released from prison in December 2018. She also observed that the child was struggling. That same day, the caseworker spoke with petitioner, who advised that the child showed up at her place of work and was disruptive. The caseworker then arranged a meeting with petitioner, the sister and the neighbor on November 20, 2018 to discuss a plan for the child's care. At this point, the child was not enrolled in school and petitioner, who had filed a person in need of supervision petition, declined to discuss the situation further. Five days later, the child left the neighbor's home to live with her boyfriend. In a follow-up conversation on November 29, 2018, the neighbor informed the caseworker that the child had taken all her belongings, as well as the neighbor's tablet, and was no longer welcome in her home. Efforts by DSS to communicate with the boyfriend's family over the next month were unsuccessful. On January 4, 2019, petitioner informed the caseworker that she suspected the child had tried calling her "but it comes up on her phone as unknown caller." Petitioner did not answer the calls. The child also reached out on Facebook, which petitioner also blocked. On January 14, 2019, petitioner informed the caseworker that she still did not have an address for the child but understood that the child mentioned going to either South Carolina or California. At the caseworker's suggestion, petitioner filed a missing person report. It was later learned that the child was still staying with the boyfriend's family.
Complicating matters, during a home visit on November 1, 2018, petitioner informed the caseworker that she had allowed the child's 19-year-old older brother to move back into her home. At that time, the child had a stay away order of [*3]protection against the brother, who had threatened to harm her. The brother, who is autistic, had been living with petitioner's stepfather, but the stepfather had passed away.
On this record, we find that substantial evidence supports the finding of maltreatment. Once the child left the sister's house, it was petitioner's obligation to establish an alternative living arrangement. We are mindful that petitioner was confronted with a difficult situation in that her son lacked alternative housing and the order of protection precluded having the son and the child reside in the same household. That dilemma, however, did not diminish petitioner's obligation to communicate with the child and proactively pursue a viable plan of care for the child. Despite the caseworker's significant efforts, the record shows that petitioner failed to do so. In the meantime, the child was experiencing the uncertainty and instability of transitioning from house to house. At the same time, she endeavored to communicate with petitioner, who was blocking her calls and did not have a plan for the child's return despite being informed that she needed to come up with one. The child was not enrolled in school, was engaging in high-risk behavior, and was no longer welcome in the homes of petitioner, the sister or the neighbor. Tellingly, the child had confided to the neighbor that she felt no one wanted her and was very upset. When deferring to the credibility determinations of the administrative factfinder, as we must (see Matter of Michael NN. v Chenango County Dept. of Social Servs., 155 AD3d at 1465), we conclude that substantial evidence supports OCFS's determination that petitioner failed to exercise a minimum degree of care in providing the child with proper supervision and guardianship, and that the child's mental health was placed in imminent risk of danger as a result (see Matter of Jacklynn BB. [Donna CC.], 155 AD3d 1363, 1364 [2017]; Matter of Clayton OO. [Nikki PP.], 101 AD3d 1411, 1412 [2012]; Matter of Lamarcus E. [Jonathan E.], 94 AD3d 1255, 1257-1258 [2012]).
For the same reasons, OCFS rationally determined that petitioner's maltreatment of the child was "relevant and reasonably related" to petitioner's potential involvement in child care, adoption and foster care (Social Services Law § 422 [8] [c] [ii]; see Matter of Natasha W. v New York State Off. of Children & Family Servs., 32 NY3d 982, 984 [2018]; Matter of Velez v New York State Off. of Children, 157 AD3d 575, 576 [2018]). As such, the determination is confirmed and the petition dismissed.
Garry, P.J., and Clark, J., concur.
Aarons, J. (dissenting).
We respectfully dissent. We agree with the majority that substantial evidence supports the determination by respondent Office of Children and Family Services (hereinafter OCFS) that petitioner failed to exercise a minimum degree of care in providing the child with proper supervision and guardianship. In our view, however, OCFS's determination [*4]that the child was placed in harm or imminent risk of harm is not supported by substantial evidence. As such, we would grant the petition.
"To establish maltreatment, the agency was required to show by a fair preponderance of the evidence that the physical, mental or emotional condition of the child had been impaired or was in imminent danger of becoming impaired because of a failure by petitioner to exercise a minimum degree of care in providing the child with appropriate supervision or guardianship" (Matter of Gerald HH. v Carrion, 130 AD3d 1174, 1175 [2015] [citations omitted]). OCFS's decision recited a plethora of facts relative to petitioner's failure to exercise the requisite degree of care or supervision. The same cannot be said regarding whether such failure harmed the child or imminently harmed the child. Rather, only in a conclusory fashion did OCFS find that petitioner's failure to exercise a minimum degree of care caused the child's physical, mental or emotional condition to be impaired or to be in imminent danger of being impaired. Indeed, OCFS's decision noted, and the record confirms, that, when the child stayed with the neighbor, the neighbor's residence was "safe" and posed "no concerns." OCFS also noted that the neighbor was approached about potentially obtaining custody of the child. Based on what OCFS found, substantial evidence, in our view, does not support the determination that the child was harmed or was in imminent risk of harm (cf. Matter of Travis XX., 224 AD2d 787, 789 [1996]; Matter of William EE., 157 AD2d 974, 976 [1990]; compare Matter of Lamarcus E. [Jonathan E.], 94 AD3d 1255, 1258 [2012]).
Reynolds Fitzgerald, J., concurs.
ADJUDGED that the determination is confirmed, without costs, and petition dismissed.